**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-314-002 (TNM)** |
| **JOSEPH P. LEYDEN** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph P. Leyden to 27 months' imprisonment, 36 months' supervised release, $2,000 restitution, and $100 mandatory assessment. The government's recommended sentence of imprisonment falls at the midpoint of the 24- to 30-month guideline range estimated by the parties in the guilty plea agreement and calculated by the Probation Office in the Presentence Investigation Report ("PSR").

## I.      INTRODUCTION

The defendant, Joseph Leyden ("Leyden"), a 57-year-old retired electrician, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

Leyden traveled to Washington, D.C. with his brother, co-defendant Daniel Leyden, to participate in the "Stop the Steal" rally. On January 6, well before then-President Trump had finished speaking at the rally, Leyden marched to the U.S. Capitol and joined the violent mob and attacks on police. Leyden personally participated in the attack on police while on the West Front, shoving Metropolitan Police Department ("MPD") Officer K.W., who was attempting to re-establish the U.S. Capitol Police ("USCP") line that rioters, just minutes earlier, had broken through. Leyden was at the very front of the mob and witnessed the most violent parts of the rioters' assaults on police.

The government recommends that the Court sentence Leyden to 27 months' incarceration for his conviction of violating 18 U.S.C. § 111(a)(1). This sentence reflects the gravity of Leyden's conduct, but also acknowledges his admission of guilt and other personal characteristics.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

**B.     Leyden's Role in the January 6, 2021 Attack on the Capitol**

On January 5, 2021, Leyden, his co-defendant and brother, Daniel Leyden, and others traveled from Illinois to Washington, D.C. On January 6, 2021, Leyden attended the "Stop the Steal" rally. However, before then-President Trump had concluded his speech, Leyden marched with other protestors to the Capitol. By approximately 12:45 p.m., a large crowd of protestors, including the Leydens, gathered to the west of the U.S. Capitol around the Peace Monument, located in the Pennsylvania Avenue, NW and 1st Street, NW roundabout.

Rioters, including Leyden's brother, Daniel Leyden, eventually toppled the barricades at the Peace Circle. The Leydens then moved closer to the Capitol Building and gathered on the West Plaza of the Capitol Grounds. Rioters there had pushed through and over the fence at the front of the West Plaza. Leyden was on the West Plaza when MPD officers arrived and began to re-establish the USCP line. *See* Image 1.



*Image 1* (Joseph Leyden circled in yellow, as officer establish the bike rack barrier)

At approximately 1:12 p.m., MPD officers instructed the rioters to move back as the officers moved metal bike racks into place, creating a barrier between the rioters and the Capitol

Building. Around 1:14 p.m., Leyden was at the front of the mob and witnessed aggressive behavior by other rioters, including a rioter standing next to him who threw water on MPD Officer S.N. *See* Image 2.



*Image 2* (Sent. Ex. A)

Shortly after this incident, a rioter tried to pull one of the bike racks back into the crowd, disrupting the newly formed police barricade. MPD Officer K.W. attempted to regain control of one of the metal barricades by trying to wrestle a bike rack out from under the rioters. *See* Image 7.

4



*Image 3* (Arm of Officer K.W. circled in red; Sent. Ex. B)



*Image 4* (Rioter standing on bike rack; Sent. Ex. B)

Leyden then lunged toward Officer K.W with his hands outstretched and pushed Officer K.W. Another MPD officer rushed to Officer K.W.'s defense and pushed Leyden to the ground.  *See* Images 5-8.



*Image 5* (Leyden circled in yellow; Sent. Ex. A)

6



*Image 6* (Leyden circled in yellow; Sent. Ex. C)



*Image 7* (Leyden circled in yellow, pushing officer K.W.; Sent. Ex. E)



*Image 8* (Leyden circled in yellow, pushing officer K.W.; Sent. Ex. E)

Leyden then retreated a short distance but remained near the police line on the West Front.

Leyden did not leave the Capitol Grounds after the altercation. Instead, Leyden remained in the

Restricted Area and later advanced closer to the Capitol Building, as shown in open source video.

on what appears to be the Lower West Terrace, just in front of the Tunnel. *See* Image 12.



*Image 9* (Leyden holding phone standing on the Lower West Terrace; Sent. Ex. F)

8

### III.    THE CHARGES AND PLEA AGREEMENT

On August 10, 2022, the government filed a Complaint charging Joseph Leyden and his brother with Assaulting, Resisting, or Impeding Certain Officers, and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1) and 2 and other offenses.

On September 21, 2022, a federal grand jury returned an eleven-count indictment charging Leyden and his brother. Leyden was charged in five counts:

> Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §111(a)(1) (Count Three);

> Civil Disorder, in violation of 18 U.S.C. §231(a)(3) (Count Four);

> Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(1) (Count Six);

> Disorderly and Disruptive Conduct in a Restricted Building or Grounds and Aiding and Abetting, in violation of 18 U.S.C. §1752(a)(2) (Count Eight); and

> Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(4) (Count Ten).

On May 23, 2023, Leyden pleaded guilty to Count Three Assaulting, Resisting, or Impeding Certain Officers Inflicting Bodily Injury, in violation of 18 U.S.C. §111(a)(1).

### IV.    STATUTORY PENALTIES

Leyden now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers Inflicting Bodily Injury, in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, he faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the U.S. Probation Office's Guidelines calculations for Leyden. That analysis is as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3E1.1(a), (b) | Acceptance of Responsibility | -3 |
| | **Total Offense Level** | **17** |

PSR ¶¶ 40-49. The PSR calculated Leyden's criminal history as category I, which is not disputed. PSR ¶ ¶ 52. Accordingly, based on the undisputed calculation of Leyden's total adjusted offense level, after acceptance of responsibility, at 17, his Guidelines imprisonment range is 24 to 30 months' imprisonment. PSR ¶ 83. Leyden's plea agreement contains an agreed-upon Guidelines range calculation that mirrors this calculation.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration within the Guidelines.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Leyden's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

States into a Constitutional crisis. As previously discussed, Leyden was at the front of the mob that tried to break through the police line established by MPD upon arriving at the U.S. Capitol Grounds. Leyden assaulted an officer—without provocation—who was trying to wrestle a bike rack out from under rioters. The nature and circumstances of Leyden's offense fully support the government's recommended sentence of 27 months' incarceration.

### B.  The History and Characteristics of the Defendant

As set out in the PSR, Leyden was arrested on the felony charge of Driving Under the Influence. The arrest did not result in a felony criminal conviction as Leyden pled to an amended charge of Reckless Driving.

### The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Leyden's criminal conduct on January 6 was the epitome of disrespect for the law and law enforcement officers.

### C.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

11

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration.

Leyden's counsel has given the Probation Officer a written statement purportedly expressing Leyden's remorse and stating that Leyden himself plans to express remorse to the Court at the sentencing hearing. This statement is copied into the PSR at paragraphs 36-38. Notably, while the statement claims *not* to minimize Leyden's conduct, the statement—which is at odds with the evidence—does just that.

First, the statement asserts that Leyden went to Washington, D.C. "with the sole purpose and intent to see President Trump's farewell speech." PSR ¶ 37. While Leyden went to the rally, he left almost an hour before then-President Trump even finished speaking. Instead of remaining for the speech, Leyden went to the Capitol, where he joined a violent mob that had overrun police barricades; indeed, along the way, Leyden's brother shoved a barricade into Officer N.R. at the Peace Circle, knocking her to the ground and causing her to injure her knee – and Leyden's brother then left her on the ground, triumphantly walking away, hands raised in the air. Third, while the statement asserts that Leyden "had no intention of getting involved in any altercation that day" but "impulsively react[ed] to seeing a young woman get pushed and landing at his feet and … unfortunately react[ed] by pushing (with an open hand) the side of an officer," PSR ¶ 38, the evidence shows that Leyden deliberately rushed at Officer K.W. and pushed him as he attempted to regain control of a metal barricade that another rioter was trying to pull back into the crowd so

as to break the newly formed police barricade. Fourth, the evidence shows that despite being surrounded by a growing mob of rioters on the West Front, which came to resemble a battle scene, Leyden did not retreat. Instead, open source video shows Leyden shortly after his altercation with Officer K.W., standing on the Lower West Terrace just outside the Tunnel, one of the most violent areas—if not *the most* violent—of the U.S. Capitol on January 6. As shown in Image 12, Leyden is smiling and clearly enjoying himself. *See* Image 12 above; s*ee also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Leyden's conduct was brazen and showed a clear lack of respect for both the police officers he assaulted and the political process they protected. Leyden was not a bystander on January 6—he knowingly, intentionally, and willingly assaulted and interfered with law enforcement officers without justification or excuse.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Eckerman*, 21-cr-623 (CRC), Eckerman maneuvered himself to the front of standoff between the mob and a small group of USCP officers who were guarding a stairway between the Memorial Doors and the Crypt. Shortly after rioters warned the officers that they were about to breach the line, Eckerman pushed USCP officer K.Y. and knocked him off balance, causing him to fall and resulting in a gap in the police line. Rioters, including Eckerman and his two companions, then surged through that gap and climbed the now-accessible stairs, allowing the mob to penetrate the second floor of the Capitol and further complicate police efforts to protect the building and its occupants. Eckerman faced a guideline range of 24 to 30 months' imprisonment. The Court sentenced Eckerman to 20 months of incarceration, 24 months of supervised release, and $2,000 in restitution.

In *United States v. Creek*, 1:21-cr-645 (DLF), the defendant pushed through a barrier, ran through the front of the crowd, and grabbed a police officer and drove him backward forcefully several feet through the West Plaza, then hit him in the face shield of his helmet. Creek then gave another officer a hard shove in the shoulders and kicked him, causing the officer to fall backward to the ground. Creek faced a guideline range of 24 to 30 months' imprisonment. Judge Friedrich

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentenced Creek to 27 months' incarceration, the middle of the applicable Sentencing Guidelines range, and 12 months' supervised release.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer K.W., did not suffer any known bodily injury as a result of Leyden's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Leyden must pay $2,000 in restitution, which reflects in part the role Leyden played in the riot on January 6.[6] Plea Agreement at ¶12. As the

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property ... including any offense committed by fraud or deceit,"   "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Leyden's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 103.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' imprisonment, 36 months' supervised release, $2,000 restitution, and $100 mandatory assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     /s/ Kyle M. McWaters
Kyle M. McWaters
Assistant United States Attorney
D.C. Bar No. 241625
601 D Street NW
Washington, DC 20003
(202) 252-6983
kyle.mcwaters@usdoj.gov

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).